IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | |
| v. | Case No. 22-CR-170-JFH |
| ELGA EUGENE HARPER, | |
| Defendant. | |

## OPINION AND ORDER

Before the Court are two motions arising from issues related to *McGirt v. Oklahoma*, 140 S. Ct. 2452 (2020). First, the United States of America ("Government") seeks a ruling as a matter of law that the location of the charged conduct in this case is within Indian country as defined by 18 U.S.C. § 1151(a). Dkt. No. 39. Second, Defendant Elga Eugene Harper ("Defendant") seeks suppression of all evidence obtained through search and arrest warrants issued by the State of Oklahoma. Dkt. No. 50. For the reasons stated, the Government's motion is GRANTED and Defendant's motion is DENIED.

## BACKGROUND

In July 2020, the Supreme Court's *McGirt* decision upended the administration of criminal justice in Northeastern Oklahoma with its holding that, while Congress had diminished the Creek reservation, it had never formally disestablished it for purposes of the Major Crimes Act. This imposed federal "jurisdiction over the apprehension and prosecution of major crimes by or against Indians in a vastly expanded Indian Country." *State ex rel. Matloff v. Wallace*, 497 P.3d 686, 692 (Okla. Crim. App. 2021). *McGirt*'s holding was later extended to other reservations as well.

As Chief Justice Roberts recognized in his *McGirt* dissent, the number of serious crimes committed by or against Indians in Northeastern Oklahoma "is no small number." 140 S.Ct. at

1

2501. "By supplanting Oklahoma law, the United States Supreme Court retroactively changed the criminal law applicable to the approximately 400,000 Native Americans living in eastern Oklahoma, as well as those accused of victimizing Native Americans." *United States v. Budder*, --- F. Supp. 3d ---, 2022 WL 1948762, at *9 (E.D. Okla. Apr. 29, 2022).

Within a year, criminal cases filed in the Northern District of Oklahoma increased nearly 200% and criminal cases filed in the Eastern District of Oklahoma increased more than 400%.[1] *See* U.S. Courts, *Judiciary Supplements Judgeship Request, Prioritizes Courthouse Projects* (Sept. 28, 2021), https://www.uscourts.gov/news/2021/09/28/judiciary-supplements-judgeship-request-prioritizes-courthouse-projects.[2] Numerous federal courts "noted *McGirt*'s tremendous impact," both legal and logistical. *Budder*, 2022 WL 1948762 at *7 (collecting cases). And the Supreme Court itself has since recognized the "significant challenge for the Federal Government and for the people of Oklahoma" caused by *McGirt*. *Oklahoma v. Castro-Huerta*, 142 S.Ct. 2486, 2492 (2022).

In the two and a half years since *McGirt* was handed down, the Court has addressed various suppression issues related to state investigations pre-*McGirt*. *See United States v. Little*, No. 21-CR-162-JFH, 2022 WL 14224529, at *1-2 (N.D. Okla. Oct. 24, 2022); *United States v. Pemberton*, Dkt. No. 47, Case No. 21-CR-012-JFH (E.D. Okla. Aug. 20, 2021). Here, Defendant presents a different question, one that is a question of first impression in this District: what jurisdictional issues may exist with a state investigation post-*McGirt*.

---

[1] The undersigned carries a multi-district caseload in both the Northern and Eastern Districts of Oklahoma.

[2] Vacancies on the bench in this District have caused even higher effective caseloads, a situation described more fully in the Court's recent opinion in *United States v. Brashers*, Dkt. No. 32, Case No. 22-CR-145-JFH (N.D. Okla. Sept. 26, 2022).

The indictment in this case alleges the charged conduct occurred on May 4, 2022, almost two years after *McGirt* was decided. Dkt. No. 13. The alleged victim, E.F., called 911 that day and reported that she had just been physically and sexually abused. She named Defendant as the assailant both on the 911 call and in later discussions with investigators. Tulsa Police Department ("TPD") responded to E.F.'s 911 call and began the resulting investigation. Dkt. No. 50 at 2. From there, the parties' descriptions of the ensuing investigation diverge.

According to Defendant, on May 5, 2022 during the morning after the assault, TPD ran an "offender search report" from the Oklahoma Department of Corrections ("DOC") on Defendant, which retuned information including identifiers and a listing of Defendant's race as "American Indian." *Id.* at 3. That same day, TPD obtained search and arrest warrants from an Oklahoma state court judge. The warrant affidavits do not mention the DOC record indicating Defendant's potential Indian status. *See* Dkt. No. 57-1; Dkt. No. 57-6.

The search warrant describes two bags—a duffle bag and a backpack—both categorized as "abandoned property" and found in an automobile at a residence where Defendant did not reside. Dkt. No. 57-1 at 2. The resident told TPD that Defendant "came in and she observed him to be sweaty and exhausted . . . . [H]e came in, shaved and left the area. [She] stated her husband . . . found two bags in his truck that were left by [Defendant]. [She] signed a search waiver and released the bags to officers." *Id.* TPD took the bags to its office to await issuance of a warrant before searching them. *Id.*

In the following days, TPD executed the search warrant, and on May 10, 2022, TPD took Defendant into custody on the arrest warrant. Dkt. No. 50 at 2. Defendant agreed to an interview with TPD detectives, where he made various statements and consented to DNA collection. *Id.* at 3. He was subsequently charged in state court. On May 12, 2022, this federal suit was initiated

3

by complaint. Dkt. No. 1. On May 13, 2022, the state case was dismissed for lack of jurisdiction. Dkt. No. 50 at 4.

The Government provides additional detail on the TPD investigation, including signed, though unsworn, statements from former TPD Detective and current Deputy US Marshal Dallas Owens ("Det. Owens"), TPD Detective Annalynn Cox ("Det. Cox"), and TPD Lieutenant Darin Ehrenrich ("Lt. Ehrenrich").

Det. Owens was the lead investigator. Dkt. No. 57-2. According to his affidavit, he located public records with differing racial identifiers for Defendant: the DOC record that listed him as "American Indian" and a DMV record that listed him as "Black or African American." *Id.* Det. Owens consulted his supervisor, Lt. Ehrenrich, about whether the DOC record "would count as proof of tribal verification," but Lt. Ehrenrich informed Det. Owens that they "needed verification from a tribe that Harper was actually enrolled." *Id.* As TPD continued the investigation, other officers assisted with information gathering, and Det. Owens remembered one unidentified officer offering to call local tribes to seek information on whether Defendant was an enrolled member or not. *Id.* He stated he was "informed at some point in those first couple of days that none of the tribes contacted had identified Harper as being an enrolled member." *Id.* Det. Owens concluded his affidavit with the summary that

> Harper was listed as "Black" on one government database and "American Indian" on another database, so at the time all I knew was that he was listed as different races in different databases. I had no further information about his Indian status, enrollment, or confirmation of Indian blood. Based on my training and experience, I knew that a person must be enrolled, eligible for enrollment, or affiliated with a tribe and have some amount of Indian blood for the federal government to have jurisdiction. Therefore, because we had been unable to verify Harper's enrollment for purposes of federal jurisdiction, I continued my state investigation.

4

> I recall that Lt. Ehrenrich received confirmation that Harper was enrolled in a tribe the day after we arrested Harper. We processed the case federally that same day.

*Id.*

Det. Cox stated in her affidavit that sometime between May 5, 2022 and May 10, 2022, she was instructed to check Defendant's tribal status. Dkt. No. 57-4 at 1. She followed TPD procedure and called tribal citizenship verification phone numbers for six local tribes: the Muscogee (Creek) Nation, Cherokee Nation, Chickasaw Nation, Osage Nation, Choctaw Nation, and Seminole Nation. *Id.* Det. Cox said she did not recall which offices answered, but that the offices that answered each denied having enrollment records for Defendant. She then informed Det. Owens and Lt. Ehrenrich that she had been unable to verify that Defendant was enrolled in a tribe.[3]

Lt. Ehrenrich supervised Det. Owens. Dkt. No. 57-5. He stated that his "routine" procedure is that if he suspects someone is Indian, he or his "detectives routinely check with local Oklahoma tribes to confirm enrollment but continue [their] investigations until obtaining the verification required to refer the case to the tribe or federal government." *Id.* at 1. Additionally, Lt. Ehrenrich stated that his training and experience informed him that "a person can identify as 'Native' or 'American Indian' but still not be 'Indian' for purposes of federal prosecution." *Id.*[4] In Defendant's case, once "initial enrollment verification checks did not show Harper to be

---

[3] Dt. Cox also stated that after Lt. Ehrenrich received confirmation that Defendant is a member of the Choctaw Nation, she "tried to recall the specific information [she] provided to the tribes . . . (and which tribes answered), in case [she] mistakenly provided incorrect identifiers, but have been unable to recall the specifics." *Id.* at 2. She stated that to the best of her knowledge, she provided accurate information to the tribes based on the identifiers provided to her. *Id.*

[4] Lt. Ehrenrich described one such recent situation in his statement, where a suspect was listed as American Indian in DOC records but all tribes contacted denied his enrollment, the suspect's family members told TPD he was not enrolled in a tribe, and no native status was ever discovered or confirmed. That suspect was charged and convicted in Oklahoma state courts.

enrolled with any of the local tribes," Lt. Ehrenrich and his unit worked with the Tulsa County District Attorney's Office to file charges in Oklahoma state court. *Id.*

Defendant was arrested on May 10, 2022, six days after the charged conduct and five days after the TPD investigation began. While Defendant was being transported to TPD's office, he informed an officer that he was a member of the Choctaw Nation. *Id.* at 2. Lt. Ehrenrich asked Det. Cox to verify this information while he and Det. Owens interviewed Defendant. *Id.* After the interview, Det. Cox told Lt. Ehrenrich that the Choctaw Nation informed her they did not have a record of Defendant being a Choctaw citizen, and Defendant was booked on his state arrest warrant. *Id.* The following morning on May 11, 2022, Lt. Ehrenrich listened to recordings of jail phone calls Defendant had made that night. In one call, Defendant's sister tells him she would "call the Native Americans" to help him, and in another, Defendant tells his sister "If you get the Natives involved, yea I need them involved before I even hit the court." *Id.* Lt. Ehrenrich then contacted the Choctaw Nation himself and obtained a roll number along with confirmation that Defendant was in fact a Choctaw citizen. *Id.* He provided this information to state prosecutors, who transferred the case to federal investigators the same day. The complaint in this case was filed the next day, on May 12, 2022. Dkt. No. 1. Defendant's state case was then dismissed.

## AUTHORITY AND ANALYSIS

### I. Indian country motion

A "district court can find, as a matter of law, a geographic area or particular location is Indian Country, and then instruct the jury to determine factually whether the offense occurred there." *United States v. Roberts*, 185 F.3d 1125, 1139-40 (10th Cir. 1999). The party seeking to invoke the jurisdiction of a federal court must demonstrate by a preponderance of the evidence

that the case is within the Court's jurisdiction. *United States v. Bustillos*, 31 F.3d 931, 933 (10th Cir. 1994).

Defendant asks the Court to submit the question of Indian country to the jury, citing a non-precedential district court opinion from the District of New Mexico which characterized *Roberts* as a decision where "the Tenth Circuit did not explicitly join those Circuits that have stated, in dicta, the trial court should *not* submit to the jury the question of whether a particular tract of land or geographic area is Indian country." Dkt. No. 41 at 2 (citations and quotations omitted). The Court declines Defendant's invitation. The Tenth Circuit was clear in *Roberts* that, "[a]s a general matter, the trial court decides the jurisdictional status of a particular property or area and then leaves to the jury the factual determination of whether the alleged crime occurred at the site." 185 F.3d at 1139. "[A] trial court [] acts appropriately when it makes the jurisdictional ruling a particular tract of land or geographic area is Indian Country, and then instructs the jury to determine whether the alleged offense occurred there." *Id.*

Here the Government submits for the Court's review a map of the Muscogee (Creek) Nation, showing that 4808 South 87th East Avenue, Tulsa, Oklahoma 74145 is within the Nation's boundaries. Muscogee (Creek) Nation Boundary Map (last accessed January 17, 2023), https://www.arcgis.com/home/webmap/viewer.html?webmap=e02bccd1bc294253a2e94567696c55fe&extent=-97.9978%2c34.5521%2c-93.941%2c36.521. The Court finds this sufficient to demonstrate by a preponderance of the evidence that the location of the charged events is within Indian country.[5] A jury, however, will determine the factual question of whether anything of a criminal nature occurred at the 4808 South 87th East Avenue, Tulsa, Oklahoma 74145 address.

---

[5] Defendant challenges both whether "the Muscogee (Creek) Nation is an Indian reservation" and "the source [and] accuracy of this on-line [sic] map." Dkt. No. 41 at 3. The Court does not look favorably on this gamesmanship. The Indian country status of the Muscogee (Creek) Nation

## II. Jurisdictional suppression motion

Separately, Defendant challenges TPD's jurisdiction to investigate his case. According to him, once TPD located a DOC record on May 5, 2022 indicating that Defendant identified as American Indian, TPD's decision to continue investigating exceeded its jurisdiction and violated Defendant's Fourth Amendment rights. Dkt. No. 50. Defendant seeks exclusion of all fruits of the search warrant and arrest warrant issued by Oklahoma state authorities, including the statements he made during his interview with Det. Owens and Lt. Ehrenrich.

As an initial matter, Defendant does not have standing to challenge the search warrant, which addressed two bags that Defendant left in an acquaintance's car after allegedly fleeing from E.F.'s residence. Dkt. No. 57-1. Defendant never returned for the bags. At hearing, the Court asked defense counsel if Defendant told the car's owner that he would be back for the property or otherwise exerted a claim or control over the bags, but she did not indicate that any such evidence existed. The Government asserts that Defendant abandoned the bag and consequently lacks standing to challenge their search. The Court agrees. *See United States v. Garzon*, 119 F.3d 1446, 1449 (10th Cir. 1997) ("[A] defendant lacks standing to complain of an illegal search or seizure of property which has been abandoned."); *United States v. Jones*, 707 F.2d 1169, 1172 (10th Cir. 1983) ("When individuals voluntarily abandon property, they forfeit any expectation of privacy in

---

cannot seriously be challenged under the current binding precedent of *McGirt*, which was unequivocal in its holding. And the online map cited by the Government is the same as the Court has relied upon in previous cases. *See, e.g.*, *United States v. Cody*, Case No. 22-CR-63-JFH, 2022 WL 2333493, at *1 (N.D. Okla. June 28, 2022). It is simply a clickable and searchable version of the same boundary map available on multiple websites and suitable for the Court's judicial notice. *See* Muscogee (Creek) Nation Maps, Muscogee (Creek) Nation Geospatial Department Geographic Information System (last accessed January 17, 2023), https://mcngis.com/index.php/maps; *United States v. Orozco-Rivas*, 810 F. App'x 660, 668 n.7 (10th Cir. 2020) (summarizing practice of taking judicial notice of Google Maps and other commercial cartography websites).

it that they might have had.").[6]  The Court thus focuses only on the arrest warrant and its fruits, including the recorded interview of Defendant conducted by Det. Owens and Lt. Ehrenrich.

No one disputes that post-*McGirt*, state authorities lack jurisdiction to investigate and prosecute crimes committed by Indians as the term is used in the legal sense.[7]  Instead, the question before the Court is whether the good-faith exception applies to TPD's continued investigation in the face of conflicting evidence about whether Defendant was Indian.  The good-faith exception states that "when law enforcement officers act in objectively reasonable reliance on a search warrant issued by a magistrate [and that warrant later turns out to be invalid], the exclusionary rule will not be applied to suppress the evidence obtained." *United States v. Pacheco*, 884 F.3d 1031, 1045 (10th Cir. 2018) (citing *United States v. Leon*, 468 U.S. 897 (1984)).  The good-faith exception has been applied to both search warrants and arrest warrants.  *See Herring v. United States*, 555 U.S. 135 (2009) (applying good-faith exception where officers arrested the defendant based on a database search that indicated a pending warrant but later discovered that the warrant had been recalled and the database had not been updated to reflect the change).

> The rationale behind the exception is that when an officer acts in good-faith reliance on a [] warrant, the deterrence rationale of the exclusionary rule is no longer applicable. Therefore, when [an investigation] is conducted pursuant to a magistrate's warrant, it is only when an officer's reliance on that warrant is "wholly

---

[6] Legal abandonment requires both subjective and objective intent to abandon the property. *Garzon*, 119 F.3d at 1449.  Both are met here.  On the subjective side, Defendant allegedly left the bags in his acquaintance's car without any mention to the car's owner that the bags were there, that he would come back for the bags, or that he otherwise intended to maintain possession and control of the bags.  On the objective side, it is not objectively reasonable to expect privacy in property left in an acquaintance's vehicle.

[7] The Government correctly highlights that "[t]he 'Indian' determination for federal jurisdiction is not race-based, but rather a legal and political-based determination." Dkt. No. 57 at 7-8 (citing *United States v. Prentiss*, 273 F.3d 1277, 1280 (10th Cir. 2001)).

9

> unwarranted" that good faith is absent, and the evidence acquired
> should be suppressed.

*Pacheco*, 884 F.3d at 1045; *Herring*, 555 U.S. at 138. Courts have repeatedly applied the good-faith exception to pre-*McGirt* state investigations. *See, e.g., Little*, 2022 WL 14224529, at *1-2; *Pemberton*, Dkt. No. 47, Case No. 21-CR-012-JFH (E.D. Okla. Aug. 20, 2021). Defendant claims the exception does not apply to this post-*McGirt* state investigation because "this case, by contrast, occurred well after *McGirt* came down." Dkt. No. 50 at 6. The issue is not so simple.

It is important to note what the Court does and does not decide today. The Court does not decide as a general rule when an investigation should be transferred between state and federal authorities. The Court's ruling is, as all district court rulings are, limited to its facts. The Court *only* examines here whether TPD acted in good faith in pursuing, obtaining, and executing the arrest warrant for Defendant when faced with conflicting evidence as to whether Defendant may be Indian for purposes of federal criminal jurisdiction. The Court concludes that it did.

On May 5, 2022 at the time of obtaining the arrest warrant, TPD knew that DOC records indicated that Defendant was Indian and DMV records did not so indicate. Defendant claims that the DOC records should have been given more weight than the DMV records. However, he provides no authority for this proposition, and no justifying reason to accord differing weights to these two state records has been presented to the Court. Moreover, Lt. Ehrenrich had personal knowledge of a situation where DOC records indicated a defendant identified as American Indian but the defendant was never established to be Indian for purposes of criminal jurisdiction. Given this context, it was not "wholly unwarranted" for TPD to continue with its investigation despite conflicting information.

TPD's routine procedure, as described by Lt. Ehrenrich, was to "check with local Oklahoma tribes to confirm enrollment but continue [their] investigations until obtaining the

10

verification required to refer the case to the tribe or federal government." Dkt. No. 57-5 at 1. All evidence available to the Court indicates that TPD put this procedure into effect with Defendant's case. Good faith is particularly evident in Lt. Ehrenrich's persistent investigation of Defendant's *McGirt* status. Initial tribal contact did not, for unexplained reasons, result in verification of Defendant's tribal affiliation. However, Lt. Ehrenrich pursued Defendant's claim that he was Indian and followed up himself with tribal authorities. When Lt. Ehrenrich obtained verification of Defendant's Choctaw citizenship, the case was transferred to federal prosecution within a day.

"In determining whether the *Leon* good-faith exception should be applied, the good-faith inquiry is confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the [Fourth Amendment-protected activity] was illegal despite the magistrate's authorization." *United States v. Rowland*, 145 F.3d 1194, 1207 (10th Cir. 1998) (quotation omitted). Here, no officers knew the status of Defendant's tribal affiliation—and by extension, the status of their jurisdiction—when they obtained the arrest warrant in question.

"If the purpose of the exclusionary rule is to deter unlawful police conduct, then evidence . . . . should be suppressed only if it can be said that the law enforcement officer had knowledge, or may properly be charged with knowledge, that the [action] was unconstitutional under the Fourth Amendment." *Leon*, 468 U.S, at 919. The Court does not see misconduct here. Rather, it sees a diligent and persistent effort to obtain relevant information on tribal status while addressing the public safety threat of apprehending a suspect in a violent physical and sexual assault. TPD had a reasonable basis to conduct its investigation between May 4, 2022 (the day of the charged conduct) and May 11, 2022 (the day Lt. Ehrenrich received confirmation that Defendant was a Choctaw citizen).

**CONCLUSION**

IT IS THEREFORE ORDERED that the Government's opposed motion to determine Indian country as a matter of law [Dkt. No. 39] is GRANTED.

IT IS FURTHER ORDERED that Defendant's motion to suppress evidence based on arrest and search made pursuant to state warrants issued without jurisdiction [Dkt. No. 50] is DENIED.

DATED this 25th day of January 2023.

_____
JOHN F. HEIL, III
UNITED STATES DISTRICT JUDGE