IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

UNITED STATES OF AMERICA,

    Plaintiff,

v.

ELGA EUGENE HARPER,

    Defendant.

Case No. 22-CR-170-JFH

## OPINION AND ORDER

Before the Court is a motion to suppress statements for *Miranda* violation and for voluntariness hearing ("Motion") filed by Defendant Elga Eugene Harper ("Defendant"). Dkt. No. 47. The United States of America ("Government") opposes the Motion. Dkt. No. 53. The Court convened two *Jackson v. Denno* hearings regarding voluntariness on January 13, 2023 and January 26, 2023, where both parties announced their intention to stand on their briefing and filed exhibits.[1]  For the reasons stated herein, the Motion is DENIED.

## STANDARD

A suppression motion under Federal Rule of Criminal Procedure 12(b)(3)(C) is meant to "determine preliminarily the admissibility of evidence allegedly obtained in violation of

---

[1]
> In *Jackson v. Denno*, the Supreme Court held that a defendant who objects to the admission of a confession on voluntariness grounds has a constitutional right to a fair hearing and an independent and reliable determination of voluntariness before the confession is allowed to be heard by the jury. At this hearing, both the underlying factual issues and the voluntariness of the confession must be actually and reliably determined.

*Lucero v. Kerby*, 133 F.3d 1299, 1310 (10th Cir. 1998) (quotation and citations omitted).

defendant's rights under the Fourth [or] Fifth Amendment[]." *United States v. Merritt*, 695 F.2d 1263, 1269 (10th Cir. 1982). The Federal Rules of Evidence generally do not apply to suppression issues. *Id.* (citing Fed. R. Evid. 104(a)). "On a motion to suppress, the district court must assess the credibility of witnesses and determine the weight to give to the evidence presented; the inferences the district court draws from that evidence and testimony are entirely within its discretion." *United States v. Goebel*, 959 F.3d 1259, 1265 (10th Cir. 2020). The defendant has the burden to show by a preponderance of the evidence that the Fifth Amendment was implicated. *Id.*; *United States v. Matlock*, 415 U.S. 164, 177 n.14 (1974). The Government has the burden to show by a preponderance of the evidence that Defendant waived his Fifth Amendment rights. *United States v. Hernandez*, 93 F.3d 1493, 1501 (10th Cir. 1996). The Court must state essential factual findings on the record. Fed. R. Crim. P. 12(d).

## BACKGROUND

Defendant was arrested pursuant to a state arrest warrant on May 10, 2022. *See* Dkt. No. 63. Body camera footage from Defendant's arrest shows him sitting on the ground attempting to talk to Tulsa Police Department ("TPD") officers before being placed in a squad car. Dkt. No. 53-1. As officers placed him in the squad car, one officer asked Defendant, "Do you want to talk to the detectives?" and Defendant immediately replied, "I mean, yes, sir, because honestly, I do business with that woman." *Id.* He continued to make sporadic statements during the approximately ten-minute car ride from the site of his arrest to the TPD station, including statements about his prior acquaintance and business history with the alleged victim in the case, an alibi for the crime, his fear of getting "tricked off" from his preexisting probation, and various rhetorical questions about being confused with other men of his race. The officer driving told Defendant "I'm just a cab driver" and "I don't know what all" was involved. After Defendant said

his sister had been trying to get ahold of him, the officer asked if the sister had told Defendant "what was going on" and he said yes. Defendant also referred to rape and robbery allegations during the car ride.

Once at the TPD station, officers placed Defendant in an interview room where Lt. Darin Ehrenrich ("Lt. Ehrenrich") and Detective Dallas Owens ("Det. Owens") joined him. Dkt. No. 53-2. They asked him a few questions about the amount of time he had lived in Tulsa, what brought him to Tulsa, and his family. Then the following exchange occurred:

> Lt. Ehrenrich: Like we said, we got some things that we need to talk about.
>
> Defendant: Yes, sir.
>
> Lt. Ehrenrich: So let -- let us read you something first. Do you have a Miranda card or your Miranda waiver?
>
> Det. Owens: No, I'm going to grab one.
>
> Lt. Ehrenrich: Okay. We're going to grab something real quick.
>
> Defendant: That's -- oh, boy, that's --
>
> Lt. Ehrenrich: Hold on. I'll grab something and then --
>
> Defendant: No, no, no. I understand. I think my biggest --
>
> Lt. Ehrenrich: Hold on.
>
> Defendant: Well, I think I can say this without having on -- on either side -- you know what I'm saying? -- hurting either side, from what they're – they are stating. This woman knows me.· Like, she really knows me. I've done business – . . . .
>
> Lt. Ehrenrich: Okay. All right. Well, let us read you this real quick. Okay.
>
> Defendant: Okay.
>
> Lt. Ehrenrich: So, number one, you do have the right to remain silent. Okay? Anything you say may be used against you in court. You have the right to talk to a lawyer before we ask you any questions and have that lawyer with you during questioning. If you

> cannot afford to hire a lawyer and want one, the court will appoint one for you before you are asked any questions. If you want to answer questions now without a lawyer present, you may do so. You have the right to stop answering questions at any time. Now, if you are a juvenile -- this one won't apply to you, because you are not a juvenile. But do you understand all of those rights that I've read?
>
> Defendant: Yes, sir.
>
> Lt. Ehrenrich: Okay. And, with that in mind, do you want to talk to us.
>
> Defendant: Yes, sir.

Dkt. No. 53-2; Dkt. No. 47-1 at 9-12. Lt. Ehrenrich and Det. Owens presented a written *Miranda* waiver to Defendant, who initialed next to each right and signed the waiver at the bottom. Dkt. No. 53-3. The officers then interviewed Defendant for approximately an hour and a half. Dkt. No. 53-2.

## AUTHORITY AND ANALYSIS

### I.   *Miranda* issues

Defendant begins with his statements made while being transported to TPD and while at TPD but before being mirandized. Dkt. No. 47 at 4. He claims that "[*i*]*f* the Court found that any statements . . . were in response to interrogation then those statements would have to be suppressed and subsequent statements *may* also have to be suppressed." *Id.* (emphasis added).[2] Defendant does not actually assert that the statements *were* made in response to interrogation. Arguably, then, he has waived this argument by failing to demonstrate by a preponderance of the evidence that the Fifth Amendment was implicated in this exchange. For completeness' sake, however, the Court examines the issue anyway.

---

[2] Defendant contends that his *Miranda* status was unclear and that he was in custody at the time of his transportation. Dkt. No. 47 at 4. The Government does not dispute this. Dkt. No. 53 at 6.

4

"It is essential to recognize that custody does not automatically render every exchange an interrogation." *United States v. Yepa*, 862 F.3d 1252, 1257 (10th Cir. 2017). "Although someone in custody may feel psychological pressure to speak arising from the fact of custody alone," the Tenth Circuit has "emphasize[d] that 'words or actions on the part of the police normally attendant to arrest and custody' are not interrogation." *Id.* (quoting *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980). "Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by [*Miranda*]." *Miranda v. Arizona*, 384 U.S. 436, 478, (1966). And "neutral efforts to clarify [] spontaneous, volunteered statements" do not constitute interrogation. *Yepa*, 862 F.3d at 1259. It is only when police use words or actions "(other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect" that an interrogation occurs. *Id.* at 1257 (quoting *Innis*, 446 U.S. at 301). This is assessed objectively, with a "focus on the perceptions of a reasonable person in the suspect's position rather than the intent of the investigating officer." *Id.*

Here, it is apparent to the Court that Defendant's statements during transportation were spontaneous and volunteered, not the product of interrogation. As TPD officers placed Defendant in a squad car, they asked him if he wanted to talk to detectives. Defendant said that he did and then began speaking about the facts of the case. He asked various rhetorical questions and described his background acquaintance with E.F. throughout the car ride. There are two points where the officer driving the squad car responded to Defendant with questions. First, Defendant volunteered that he had been in contact with his sister, and the officer driving asked whether Defendant's sister had told him what was going on. Later, Defendant said that he did not want any trouble because he was already on probation, and the officer asked him why he was on probation. Both these questions by the officer were neutral efforts to clarify Defendant's

5

spontaneous, volunteered statements. Defendant also tried to get the officer to engage in conversation about the case, but the officer informed Defendant more than once that he was not familiar with the case and was simply transporting Defendant.

The exchange of questions and answers at TPD was closer to an interrogation, but the Court does not find that the general inquiries TPD made exceeded the realm of questions normally attendant to arrest and custody. The officers interacting with Defendant asked him how long he had lived in Tulsa; what his sister's name was; where he was from; what family he had; how he came to Tulsa from his previous residence; a clarifying question about the type of work Defendant described he did; whether Defendant had children or grandchildren; and what his granddaughter's age was. None of these were objectively likely, from the perspective of a reasonable person in Defendant's position, to elicit incriminating information. Defendant had already volunteered various information to TPD about his fairly recent relocation to Tulsa and about his family, specifically his sister. The Government asserts that TPD's questions were meant to ensure Defendant was competent to waive his *Miranda* rights. This is a reasonable construction of the interaction and one which falls within the realm of questions normally attendant to arrest and custody. Because none of Defendant's pre-*Miranda* statements were made in response to interrogation, none of them merit suppression.

## II. Voluntariness

The Tenth Circuit applies similar analyses to the voluntariness of *Miranda* waivers and the voluntariness of statements made during interrogation. *See United States v. Cash*, 733 F.3d 1264, 1281 (10th Cir. 2013); *United States v. Smith*, 606 F.3d 1270, 1276 (10th Cir. 2010). "Voluntariness is determined under the totality of the circumstances, and no single factor is determinative." *United States v. Young*, 964 F.3d 938, 942 (10th Cir. 2020). To assess

voluntariness, courts consider "the age, intelligence, and education of the suspect; the length of the detention and questioning; the use or threat of physical punishment; whether *Miranda* safeguards were administered; the accused's physical and mental characteristics; and the location of the interrogation." *United States v. Perdue*, 8 F.3d 1455, 1466 (10th Cir. 1993).

Here, Defendant was an adult with a GED and college credits who spoke and read English. He was well-acquainted with the justice system because of numerous past convictions. *See* Dkt. No. 62. The detention and questioning were not inordinately long or drawn out and they did not involve the use or threat of physical punishment. TPD attempted to give oral *Miranda* warnings three separate times, with Defendant interrupting them each time to engage them in conversation. TPD then presented Defendant with a written *Miranda* waiver form, and Defendant initialed next to each right before signing the form. *See* Dkt. No. 53-3. Defendant was coherent, mostly calm, and conversational throughout the interview. The interrogation, while at a law enforcement station, was in an interview room with furniture and good lighting. All of these factors weigh toward finding that Defendant was able to exercise his own self-determination and was not coerced or overborne during his police interaction.

Regarding Defendant's *Miranda* waiver, the Government must demonstrate that Defendant's waiver was made voluntarily, knowingly, and intelligently. *Smith*, 606 F.3d at 1276. A waiver must be "the product of a free and deliberate choice rather than intimidation, coercion, or deception" and "must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.* (quoting *Smith v. Mullin*, 379 F.3d 919, 932 (10th Cir. 2004)). The factors discussed above—particularly the lack of intimidation or coercion in the setting, Defendant's prior acquaintance with the justice system, TPD's repeated attempt to complete their spoken *Miranda* warnings only to be cut off by Defendant three separate

times, and TPD's eventual reading of the rights accompanied with Defendant's signed waiver—support the Court in concluding that the waiver was proper and voluntarily made.[3]

Regarding the voluntariness of Defendant's post-*Miranda* statements,

> The question this court must resolve is whether "the [statements are] the product of an essentially free and unconstrained choice by its maker? If it is, if he has willed to [speak], it may be used against him. If it is not, if his will has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process."

*United States v. Lopez*, 437 F.3d 1059, 1063 (10th Cir. 2006) (quoting *Perdue*, 8 F.3d at 1466). Here, the same factors that support a finding of voluntary *Miranda* waiver support a finding of voluntary statements, including Defendant's age, education, demeanor, and experience with the justice system; the location and duration of the interrogation; and the absence of physical force or coercion. Defendant claims he was not clearly advised of the charges against him and that reference to possible charges was not made until well into the interrogation. Dkt. No. 47 at 5. However, Defendant had already acknowledged during transportation that he was aware the investigation involved rape and robbery allegations, and he repeatedly said he "definitely" knew why TPD wanted to talk to him. Defendant also suggests that TPD presenting him with gruesome photographs of the alleged victim "may have been a coercive tactic," *id.*, but—even if true—that factor would not be so significant as to outweigh the numerous factors indicating Defendant was able to use his will and self-determination throughout the interview with TPD. The Court finds that Defendant's statements were voluntary.

---

[3] Defendant's eager engagement with TPD also demonstrates waiver. *See Berghuis v. Thompkins*, 560 U.S. 370, 386 (2010) ("If Thompkins wanted to remain silent, he could have said nothing in response to [] questions, or he could have unambiguously invoked his *Miranda* rights and ended the interrogation. The fact that Thompkins made a statement . . . after receiving a *Miranda* warning . . . [means] that he engaged in a course of conduct indicating waiver.").

## CONCLUSION

IT IS THEREFORE ORDERED that Defendant's motion to suppress statements for Miranda violation and for voluntariness hearing [Dkt. No. 47] is DENIED.

DATED this 30th day of January 2023.

JOHN F. HEIL, III
UNITED STATES DISTRICT JUDGE